Harold S. ORTON, Plaintiff,

v.

ROBICON CORPORATION and Jeannette Corporation, Defendants.

Civ. A. No. 71–1148.

United States District Court,
W. D. Pennsylvania.

July 12, 1974.

Additional Findings Aug. 15, 1974.

Webb, Burden, Robinson & Webb, Pittsburgh, Pa., for plaintiff.

Brown, Murray, Flick & Peckham, Lawrence G. Zurawsky, Pittsburgh, Pa., for defendants.

## OPINION

WEBER, District Judge.

This is an action under the patent laws of the United States. The court has jurisdiction and venue is properly laid in this court.

Plaintiff, Harold S. Orton, is an individual residing in Greensburg, Pennsylvania, in this district. He is the inventor of an Electric Resistance Furnace on which he applied for a patent on May 3, 1967 and upon which patent No. 3,-395,273 was issued by the United States Patent Office on July 30, 1968.

Plaintiff has brought this action for infringement against the Jeannette Corporation, a Pennsylvania corporation, having its place of business in Jeannette, Pennsylvania, in this district, and against Robicon Corporation, a Pennsylvania corporation, having its place of business in Allegheny County, Pennsylvania.

The complaint charges that defendant Jeannette Corporation has installed an electrically heated glass furnace in its plant which infringes certain claims of Orton's patent and that Robicon Corporation supplied the electrical circuitry for the tank. In the contract for the supply of the electrical circuitry Robicon gave Jeannette a "hold harmless" agreement specifically addressed to the patent in suit.

The Orton patent relates to an electrical resistance furnace used for the melting of glass. Glass is produced by the melting of a mixture of sand, lime, soda ash, and borax, to which, in commercial production, scrap glass (cullet) is added. It is then heated in a tank to a temperature in excess of 2000° F. to form a viscous melt, which is then drawn off to form the various products desired. On cooling it does not crystallize but remains in its amorphous state. Most commercial tanks are continuous flow tanks in which the mixture is fed into the melting section, where it is first heated by fossil fuels (fuel oil or gas) to a molten state and then passed to a refining tank or section, and finally the melt is drawn off for the forming process.

The use of electrical energy for glass melting and refining has been extant since the end of the 19th century.[1] It

---

1. Seven prior art references were cited by the Patent Office from 1950 through 1965 and the defendants have advanced other pat-ents and publications in support of their defense of anticipation.

is done by introducing an electrical current into the glass melt. Glass or its components are not electrical conductors at ordinary temperatures, but become highly conductive at molten temperatures. This quality is known as a "negative coefficient of resistance" or "negative resistance" and means that the hotter the molten glass the greater the conductivity. In thus conducting current heat is generated and this heat melts the glass and the higher the temperature of the melt the greater the resulting current. This quality causes the furnace to run out of control, produce hot spots, blister, or damage the structure of the furnace.

Initially electrical melting of glass was limited to "boosting" of tanks where the principal heat source was fossil fuels. Interest in greater use of electrical energy for this purpose developed, particularly in European countries. Orton viewed these developments and in 1963 he assisted in the design and installation of a new electrical furnace for glass melting at the plant of Jeannette Corporation, known as Tank No. 6, which was in operation for a period but which was confronted by problems of hot spots, and unbalanced heat. It is no longer in operation. Other attempts at utilizing electrical energy for melting produced similar problems.

Orton had worked on these problems for several years and in 1965 he designed a new type of electrical furnace which he believed would overcome these obstacles. This is the subject matter of the application for patent filed by him May 3, 1967 resulting in the issuance to him of Patent No. 3,395,237 on July 30, 1968.

Late in 1970 or early in 1971, Jeannette Corporation considered construction of a new all electric glass melting furnace. It sought bids on the electrical system for the new tank, and on May 28, 1971, Orton submitted a proposal together with a drawing of the configuration and electrode placement. Jeannette constructed the tank, known as Tank No. 8, but it awarded the electrical construction contract to defendant Robicon Cor-

poration on November 2, 1971 upon a later proposal submitted by that company, with a "hold harmless clause" in which Robicon agreed to indemnify Jeannette against claims of infringement of the Orton patent. The new furnace was placed in operation late in 1972.

Orton claims that Jeannette Tank No. 8 infringes on claims 1–3, 5–8, 14–16 and 19–21 of his patent. The defendants have not contested the issues of infringement at trial except for one limited issue, and have defended on the grounds of invalidity of the Orton patent.

The one contested issue of infringement was the meaning of the term "independent electrical circuit" as used in the patent claims, and plaintiff's evidence was sufficient to establish that the Jeannette Tank No. 8 embodied an independent electrical circuit for each pair of electrodes in the tank. We, therefore, find that the Tank 8 infringes upon the claims asserted in the patent in suit.

## THE CLAIMS OF THE PATENT

The inventor asserts that no prior electric melting furnace achieved the desired results because uneven heat developed throughout the tank and the uneven heat accelerated the imbalance because the hotter areas were more highly conductive of the electric current. The inventor claims that no prior electrical furnace for glass melting was successful because this problem always appeared and no system of effectively keeping uniform heat in the molten mass had been devised up to this time.

The invention is described as follows in the patent. [Col. 1, lls. 20–26]:

"This invention relates to an electric resistance furnace having an even number of vertical electrodes and, for each pair of electrodes, an independent circuit containing a current-control means and a constant voltage source. More specifically, it relates to the use of solid state gated switch controls, particularly silicon controlled rectifiers, as control devices in such furnaces."

The electrical control system is more fully described as follows: [Col. 1, line 64 to Col. 2, line 6]:

"In my invention the electrodes are paired and each pair of electrodes is part of an independent electrode circuit; the current in each circuit is individually controlled. Each circuit is independent in that current cannot flow from one circuit to another circuit except by flowing through the glass, and since the current in each circuit is controlled individually, very little current can flow between circuits by flowing through the glass. Thus, in a three-phase system most of the interphasal current is eliminated. 'Hot spots' do not develop since an increased current flow in any circuit is immediately controlled, where 'control' means the ability to maintain the average value of the square of the current at a desired level in spite of variations in the resistance of the melt."

The Orton patent concludes with twenty-six claims. Infringement of Claims 1 to 3, 5 to 8, 14 to 16, and 19 to 21 are involved in this action.

Claims 1, 6, 14 and 19 are independent claims, the remainder or dependent, that is they incorporate every limitation of the claims from which they depend. We believe that Claim 19 is representative of the claims in suit. It reads as follows: [Col. 6, line 52 to Col. 7, line 4]:

"An electric resistance furnace, including its electrical system, for use with a three phase power source of a substantially constant voltage comprising:

(A) a heat-resistant container provided with means for feeding charge materials into said container and means for tapping a melt from said container;

(B) an even number of electrodes, at least six, positioned vertically within said furnace and fixed relative thereto, each electrode being at a substantially equal distance from at least two of the nearest electrodes;

(C) an independent electric circuit for each pair of electrodes, each circuit including the secondary windings of a separate transformer and a means for opening and closing each of said circuits whereby the average value of the square of the current in each circuit is controlled; and

(D) a second electrical circuit for each independent electrical circuit, each second electrical circuit including the primary windings of a transformer the secondary windings of which are a part of a corresponding independent electrical circuit, and electrical connections to a selected two of the three phases of said power source, said selected two phases being selected for different circuits in a total of three different ways, each way being selected as nearly as possible the same number of times that each other way is selected."

Orton's patent required a constant voltage, multiple pairs of electrodes, independent electrical circuits for each pair of electrodes, a separate automatic means of controlling the current in each independent circuit, and an even number of electrodes placed vertically throughout the tank in a pattern by which each electrode will be an equal distance from at least two of the nearest electrodes.

Orton insists upon a constant voltage source with control of current in each electrode circuit. The end result to be achieved was an even distribution of the heat generated by the electric current throughout the molten mass, which the inventor describes as a "frying pan effect". We assume that he is referring to the old-fashioned cast iron skillet.

Defendant argues that the claim of constant voltage is incorrect and that when a control is interposed on each pair of electrodes it must of necessity vary the voltage across the electrodes because if you don't control the voltage you can't control the current, otherwise Ohm's law, a basic law of physics, would be invalid. Ohm's law says the voltage (E) equals the current (I) times the

resistance (R). E=IR. Thus if the resistance decreases because of the increased conductivity of the molten glass, with a constant voltage, current must increase. Defendant then argues that the only way to reduce the current is by reducing the voltage.

Orton insists that his invention maintains a constant voltage throughout the system and contains a means of controlling current for each independent pair of electrodes, or more exactly the average value of the square of the current, which is the measure of the heat generated in a resistor, using alternating current. By requiring independent circuits for each pair of electrodes, he eliminates most of the flow of current between other electrodes than the pair on the independent circuit through the molten glass. This is particularly advantageous in a three phase system which is supplied to most industrial users of electricity in reducing unwanted flow of current between the non-paired electrodes with phase differences. Most of the interphasal current is eliminated by the individual control system, where control means the ability to maintain the average value of the square of the current at a desired level in spite of variations in the resistance of the melt.

The current control means may be done by either introducing a resistance into the circuit, which has many disadvantages, or by breaking the circuit for short periods of time, which is the inventor's preferred method. Because the average value of the square of the current is a continuous average over a period of time, the heat may be maintained at a constant level even though a greater current may flow during the time that a circuit is closed. The methods of controlling current by breaking the circuit are known in the electronics industry.

We, therefore, conclude that the patent's claims of constant voltage and control of current in independent circuits are valid, in the sense that the heat produced in the melt by the current between paired electrodes is controlled, and Ohm's law remains inviolate.

■ We do not find this invention to be obvious to a person with ordinary skill in the art under 35 U.S.C. § 103. This requires that the subject matter as a whole at the time of the invention would have been obvious.

"Goldstein argues, however, that the method patented by Spitz was obvious at the time the invention was made because each of the steps described in the Spitz claims was well known in the prior art. However, the essence of the Spitz invention did not lie in the individual steps, but rather, consisted of combining the steps in an unsuggested manner into a process that would achieve a substantially different function and result from the other processes of which the individual stages were a part. Where such occurs the invention of a process may be patentable despite the fact that the individual phases were known in the art. . . . (citations omitted). It is the subject matter as a whole which must be considered in determining obviousness." (pp. 72–73).

Trio Process Corp. v. L. Goldstein's Sons, Inc., 461 F.2d 66 [3rd Cir. 1972]

Under the standards of the scope and content of the prior art, the differences between the prior art and the claims at issue, and the level of ordinary skill in the pertinent act, as prescribed in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 [1966], set forth at length in the testimony here, we cannot find this patent obvious under 35 U.S.C. § 103.

### ANTICIPATION

"For there to be anticipation of the device by the prior art, each claim of the patent-in-suit must be embodied in a *single* prior art reference, and the prior reference must contain within its four corners adequate directions for the practice of the patent claim invalidated. Otherwise stated, for a prior patent to anticipate an invention under § 102, it is necessary that the prior patent teach in a single structural combination all of the elements

of the invention; additionally, the elements must perform substantially the same function in substantially the same way to achieve substantially the same result in both the prior patent and the claimed invention."

Antici v. KBH Corporation, 324 F. Supp. 236, 239–240 [N.D.Miss.1971]

█ This rule applies whether the anticipation is a publication, a patent or a public use or sale.

█ Defendant has asserted anticipation of prior public uses, publications, and patents, outside the seven patent references cited by the examiner. Our conclusion in examining these is that they do not meet the above criteria for anticipation,

*Jeannette Tank No. 6.* designed by Mr. Orton and others at Jeannette Corporation in 1963. It did not have independent circuits for each pair of electrodes and means for controlling the current in these circuits. When Jeannette desired to build a new tank in 1970 it did not follow the design of the 1963 tank but chose to adopt the teaching of Orton's patent.

*The General Electric Tank at Pittsfield, Mass.* was not used in the ordinary course of trade prior to the critical date. It produced small quantities of glass which was used as cullet (scrap glass) and recycled in the furnace for experimental purposes. The process was kept secret by General Electric Company. It has sidewall electrodes, and not vertically placed electrodes, controlled by voltage regulators. The published description of this furnace did not appear until the February 1968 issue of the "Ceramic Industry Magazine", after the Orton patent had issued. (DX 23).

*The article by Dipl. Ing. Horowitz* of Switzerland, appearing in "The Glass Industry", Feb. 1953, describes the problems of the industry generally, but does not teach how the solution may be accomplished except to suggest the regulation of each pair of electrodes by controlling impressed voltage. (DX 24).

*The article by M. G. Gibbs* of London, appearing in Glass Technology, Vol. 6, No. 4, August 1965. This is a foreign publication and must meet the criteria of Seymour v. Osborne, 11 Wall 516, 78 U.S. 516, 20 L.Ed. 33 [1870] that:

". . . the description and drawings contain and exhibit a substantial representation of the patented improvement in such full, clear, and exact terms as to enable any person skilled in the art . . . to make, construct and practice the invention . . .". (p. 555).

Gibbs shows only two electrodes. It is primarily designed for a feeder tank. It advises against off-on switching of the current, which is exactly contrary to the Orton control system.

*DeVoe Patent No. 2,490,339* (DX 29), was not cited by the patent examiner although it was in the class and sub-class searched. It has multiple electrodes positioned along each sidewall. The electrodes are in multiple sets of six, each pair of three having a common current control, contrary to the independent control for each pair taught by Orton. The Orton teaching of uniform and equidistant spacing of vertical electrodes in the tank is now shown.

*De Voe Patent No. 2,600,490* (DX 30) again does not show pairs of electrodes connected in independent circuits, nor equidistant spacing.

We conclude that none of the prior art references cited by defendants describe the invention as set forth in the claims of Orton, Patent No. 3,395,237.

### PRIOR PUBLIC USE

█ The defendants cite a contract of sale of equipment covered by the claims of the patent in suit more than one year prior to the date of the application in question to defeat this patent under 35 U.S.C. § 102(b) which provides in pertinent part:

"A person shall be entitled to a patent unless

. . . (b) the invention was
. . . in public use or on sale in

this country, more than one year prior to the date of the application for patent in the United States."

The filing date of the patent in this case is May 3, 1967.

The evidence shows that Continental Can Company on July 2, 1965 signed a purchase order to Mr. Orton, the plaintiff patentee here, for the installation of equipment proposed by him covered by the claims of the patent in suit in its Clarksburg, West Virginia plant. The purchase order contained a performance warranty to produce fifty-five (55) tons soda line glass per day (D.ex. 15). It started production in January 1966 and by April of 1966 had produced 3,226 tons of glass of which 2,572 tons were sold as glass ware. The difference is accounted for in changing molds and rejected moldings. (D.ex. 3). This rate of production was achieved in the four months prior to the statutory bar of one year prior to the date of application, but the production statistics continued to maintain the same rate during the remainder of the year 1966. While temporary controls were first installed permanent controls were installed in February 1966. In March of 1966 the furnace was producing forty-two (42) to forty-three (43) tons of glass per day. The control system in use was that described in the Orton patent. It was a production furnace and had production lines attached to it and the production was sold commercially by Continental Can. The furnace operated every day, except for certain holidays, before May 1, 1966, for the purpose of commercial production, and produced between forty (40) and forty-five (45) tons daily. It continued to operate at this rate for the rest of 1966 except for a shut-down of two or three weeks in September 1966 when there was a break in the bottom part of the furnace tank which required repairs, after which production was resumed.

The evidence further reveals that in August 1965 when Mr. Orton was initiating his proposals to build the electric control system for Continental Can Company at Clarksburg, West Virginia, he was also discussing the electrical control system of a glass furnace installation to be supplied by him for Brockway Glass Company at Washington, Pennsylvania. The witness, James R. Joseph, the Chief Design Engineer, Electronics, was involved in the installation both at Brockway Glass and Continental Can because of a technical supervision agreement under which Brockway supplied technical advice and supervision to Continental. Both the Brockway installation and the Continental Can installation were under discussion at the same time. Both the Brockway installation and the Continental Can installation were constructed in accordance with the teachings of the Orton patent, and both the Brockway furnace and the Continental Can furnace used the same electrical control system, which was supplied by Mr. Orton. The Brockway furnace started into production in June 1966.

Mr. Joseph also testified that at an inspection trip to Clarksburg in March of 1966 the Continental Can furnace was in production, all components were in working order and he could detect no malfunction.

This witness testified that there were some difficulties with the operation of the Continental Can furnace in 1966, and he made some visits to check on these. He testified that these difficulties were cured not by the application of any new invention or discovery, but were accomplished by engineers who recognized the problem and proposed the solution.

Mr. Joseph also testified that while the Brockway furnace and the Continental Can furnace were very similar in their electrical control systems, Brockway had little trouble in operation while Continental Can had had considerable trouble. He attributed this to the fact that the two furnaces were operated differently, and that Brockway kept a closer watch on their operations that did Continental. He also cited the benefits which Brockway derived from experience of prior operations at Continental Can.

The plaintiff admits that the Continental Can furnace installed at Clarksburg, West Virginia, was intended to embody the Orton invention and eventually did embody the Orton invention. However, the plaintiff argues that the Orton invention was not embodied in complete and operative form until after the re-construction in September 1966, long after the critical date of May 3, 1966, and therefore was not "in public use before the critical date". While the purchase order of Continental Can issued on July 2, 1965 called for the construction of the equipment according to a plan and proposal no such equipment or structure had been built by that date and the contract to construct from plans and deliver in the future is not a sale when the article is ordered but when it is delivered in operative form.

"To constitute public use, it is necessary that the invention be embodied in an operative form. The embodiment constituting the public use must be so complete in its action as to exhibit the inventive idea involved in the invention under consideration."

Deller's Walker on Patents § 65, pp. 313–314.

A contract to construct from plans and to deliver in the future a machine not proven to be previously completed is not proof that the product was "on sale" under Section 102(b) of the statute.

Nevertheless, the preponderance of credible evidence indicates that the equipment, constructed in accordance with the teachings of the Orton patent, was built and operational and used commercially for the production of goods for sale in the first four months of 1966 which is more than one year prior to the date of the patent application. Plaintiff's testimony that the equipment was not functioning in the desired manner, supported by extensive documentation of complaints of malfunction by the purchaser and a continuing refusal by the purchaser to pay the balance of the contract price until these complaints were satisfied does not establish that the electrical control system described by plaintiff's patent was not fully installed and operational before May 3, 1966, but solely that subsequent adjustments, repairs or alterations were needed to achieve the optimum possible function of the invention. We have commented elsewhere that the testimony shows these alterations to have been resolved by the application of engineering principles rather than by new invention or new design. The witnesses have testified that the equipment as described in the patent for the electrical control system was fully installed before May 3, 1966.

Plaintiff contends that it is clear that his invention was not embodied in complete and operative form in the Continental Can furnace until long after the critical date because of the need for alterations and modifications and that there was consequently no sale before these alternations or modifications were completed. Furthermore, plaintiff argues that any use of the Continental Can furnace before the critical date was an experimental use.

The courts have recognized the doctrine of experimental use as an exception to the "on sale" provision of the statute. The Supreme Court has said:

"When the subject of invention is a machine, it may be tested and tried in a building, either with or without closed doors. In either case, such use is not a public use, within the meaning of the statute, so long as the inventor is engaged in good faith, in testing its operation. He may seek cause to alter it and improve it, or not. His experiments will reveal the fact whether any or what alterations may be necessary . . . And though, during all that period, he may not find that any changes are necessary, yet he may be justly said to be using his machine only by way of experiments; and no one would say that such a use, pursued with a bonafide intent of testing the qualities of the machine, would be a public use, within the meaning of the statute. So long as he does not volun-

tarily allow others to make it and use it, and so long as it is not on sale for general use, he keeps the invention under his own control, and does not lose his title to a patent."

Elizabeth v. Pavement Company, 97 U.S. 126, 134, 24 L.Ed. 1000 [1877].

In a case of slightly more recent vintage on the subject of experimental use the Supreme Court has further defined the concept of "experimental use or sale":

". . . but where the use is mainly for the purposes of trade and profit, and the experiment is merely incidental to that, the principle and not the incident must give character to the use. . . .

In the present case, the use of the machine was apparently for the purpose of conducting an established business; . . . That it was capable of improvement need not be denied, nor that, while it was in daily use, its owner and inventor watched it with a view of devising means to meet and overcome imperfections in its operation; but this must can be said in every such case. There are few machines, probably, which are not susceptible of further development and improvement, and the ingenuity of mechanics in inventors is commonly on the alert to discover defects and invent remedies. The alterations made in the machine in question, however useful, were not vital to its organization. Without them, it could and did work so as to be commercially successful."

Smith & Griggs Manufacturing Co. v. Sprague, 123 U.S. 249, 8 S.Ct. 122, 31 L.Ed. 141 [1887].

■ We believe the controlling question is whether the use of the invention described by the claims of the patent was commercially successful and primarily for profit rather than experimentation. See Pickering v. Holman, et al., 459 F.2d 403 [9th Cir. 1972].

There is no evidence, contemporaneous to the installation of the Continental Can furnace, that the installation was intended by either seller or buyer as experimental. From the buyer's expectations it was investing approximately one million dollars in the installation of the furnace, of which $206,378 represented the provision and installation of the plaintiff's electrical control system. The buyer obtained a guarantee of performance of fifty-five (55) tons per day. The contract also provided that:

"Any changes in the electrical system in which Orton Electric Furnace Engineering does not concur and which they cannot guarantee as their own design, they are to advise in writing. Continental Can Company will advise at that time if Continental Can Co. will go with Orton design or Continental design for which Continental Can Co. will be fully responsible. In the latter course, this will relieve Orton of full responsibility for total operation of the supplied equipment except manufacture warranty and Orton's responsibility will be for the equipment as per specification of individual units, but total system responsibility is cancelled." (DX–15).

■ We draw the inference from this provision of the contract that the seller insisted upon the construction according to his design and that this design was firm and fixed, and that the operational or performance guarantee was conditioned upon carrying out that design. We find this inconsistent with the claim that the installation was experimental.

Further inferences that the installation was not intended to be experimental are derived from the size of the installation, the cost of the installation, and the intended use of the installation. Its size was that of a regular commercial production furnace, approximately the same size as was installed for Brockway Glass Company a few months later. The cost of the entire furnace was in the neighborhood of a million dollars, and the tank was intended for use in the regular commercial production of glass in the business of Continental Can Company, and it was being used in that production in substantial commercial quan-

tities by Continental Can Company for at least three months before the critical date.

In U. S. Chemical Corp. v. Plastic Glass Corp., 243 F.2d 892 [3rd Cir. 1957] the court found that the sale and delivery to three customers of plastic patterned sheets at a price exceeding $15,000 in the five months before the statutory date of one year prior to the application for patent constituted a public use or sale within the purview of the statute despite the patentee's claim that this use of the patent and sale of the product was merely experimental to determine the "production controls" necessary for the successful commercial exploitation of the product. The court concluded:

> "We sum up the application of the principle to the case at bar by saying that where, as here a patentee has used the process of a patent to create a product which has been sold on the market more than one year prior to the patent application, such use of the process and sales constitute 'prior use' within the meaning of Section 102(b), 35 U.S.C. We are of the opinion that the patentee cannot avoid the impact of the statute by asserting that the sales were experimental to determine 'production controls', at least under the circumstances at bar. We cannot but conclude that the application of such a theory here would lead to an unwarranted extension of the patent monopoly." (p. 894)

█ It is of no moment that the commercial use of the invention was by other persons with the permission of the inventor, either with or without compensation; it is still a public use. O'Brien v. Westinghouse Electric Corporation, 293 F.2d 1 [3rd Cir. 1961].

In Metallizing Engineering Co. Inc. v. Kenyon Bearing & Auto Parts Co., 153 F.2d 516 [2nd Cir. 1946], Judge Learned Hand reviewed the history of the public use provisions of all the patent acts and their judicial interpretation and found that from the time of the first Patent 7 L.Ed. 327 [1829], where the court Act, 1 Stat. 109, the statutes have required that the subject matter had not been "before known or used". The first case construing this requirement was Pennock v. Dialogue, 2 Pet. 1, 27 U.S. 1, held that the sale of 13,000 feet of hose before the grant of a patent invalidated the patent, even though the product did not disclose the secret of its invention.

The principle argument of plaintiff patentee is the judicial exception of "experimental use" established in City of Elizabeth v. America Nicholson Pavement Co., 97 U.S. 126, 24 L.Ed. 1000 [1877].

Our examination of the *City of Elizabeth* case shows that the experimental use was well-established by the evidence. The inventor had put down a stretch of pavement which was publicly used for six years before his application for a patent, and this was contended to be a "public use" within the meaning of the law. The Court found otherwise:

> "To determine this question, it is necessary to examine the circumstances under which this pavement was put down, and the object and purpose that Nicholson had in view. It is perfectly clear from the evidence that he did not intend to abandon his right to a patent. He had filed a caveat in August 1847, and he constructed the pavement in question by way of experiment, for the purpose of testing its qualities. The road in which it was put down, though a public road, belonged to the Boston and Roxbury Mill Corporation, which received toll for its use; and Nicholson was a stockholder and treasurer of the corporation. The pavement in question was about seventy-five feet in length, and was laid adjoining to the toll-gate and in front of the toll-house. It was constructed by Nicholson at his own expense, and was placed by him where

it was, in order to see the effect upon it of heavily loaded wagons, and of varied and constant use; and also to ascertain its durability, and liability to decay." (p. 133).

This was sufficient to cause the court to determine that such use was not a public use.

We find no such circumstances in the present case, except the patentee's present claim of an experimental use exception, which he supports by evidence of the need for adjustments, alterations and repairs during the first year of operation, eight months of which were within the statutorily protected period. We find clear and convincing evidence of public use by a manufacturer for the purpose of commercial production for profit of the invention, for a period of over three months prior to the statutory date.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the parties and the subject matter of this action.

2. No claims of Plaintiff's United States Patent No. 3,395,237 are invalid and unenforceable under 35 U.S.C. § 102 by reason of being anticipated by the prior art.

3. No claims of Plaintiff's United States Patent No. 3,395,237 are invalid and unenforceable under 35 U.S.C. § 103 as being directed to a subject matter obvious to one of ordinary skill in the art at the time the invention was made.

4. All claims of Plaintiff's Patent No. 3,395,237 are invalid and unenforceable under 35 U.S.C. § 102(b) the subject matter of said claims having been on sale, having been sold, and having been in public use for more than one year prior to the filing date of the application which resulted in the Patent.

## ADDITIONAL FINDINGS

The following findings are hereby made in the above action under Fed.R. Civ.P. 52(b), pursuant to the motion of plaintiff, in addition to those contained in the Court's Opinion of July 12, 1974:

The Continental Can Tank 2A installed at Clarksburg, West Virginia, operated prior to the critical date and thereafter with a direct current flowing between electrode pairs. A direct current between electrodes results in electrolysis at the electrodes. This direct current caused an erosion of some of the electrodes. The furnace was still operable. Extensions were added to the eroded electrodes. This is not uncommon in electric glass melting furnaces. This direct current component results in a small amount of "dirty" glass being produced.

During this time prior to the critical date Tank A2 was producing approximately 45 tons of glass per day out of a design capacity of 55 tons per day.

Subsequent repairs, adjustments or alterations after the critical date reduced but did not eliminate the direct current component.

The conclusions of law contained in the Opinion of July 12, 1974 are not affected by the within additional findings.

So ordered.