### DUFFY *v.* REYNOLDS and others.

*(Circuit Court, D. New Jersey.* August 11, 1885.)

1. PATENTS FOR INVENTIONS—EVIDENCE—ORIGINALITY OF INVENTIONS.

When, in a suit for infringement of a patent, it is set up as a defense that complainant derived his idea of the patented invention from some third party who first conceived it, the burden of proof is on defendant, and any doubt respecting the evidence is fatal to the defense.

2. SAME—PATENT No. 184,352—APPARATUS FOR DRYING HIDES.

On examination of the evidence, *held,* that James N. Duffy must be considered as the original and first inventor of the combined mechanism of the second, third, and fourth claims of patent No. 184,352, granted to him November 14, 1876, for "improvement for apparatus for drying hides."

3. SAME—INFRINGEMENT—PUBLIC USE—CONSTRUCTION OR PURCHASE OF MACHINE WITH KNOWLEDGE OF INVENTOR—REV. ST. §§ 4886, 4899.

Rev. St. § 4899, must be construed in connection with section 4886, and it may be said generally that, while section 4886 makes void every patent where it is shown that the invention was in public use or on sale for the period of two years before the application for the patent, section 4899, although allowing the letters patents to stand, excepts from liability to the inventor all persons who have used for less than two years any patented machine or article that has been purchased or constructed with the knowledge and consent of the inventor prior to his application for the patent. Infringement not shown.

In Equity.

*G. E. P. Howard,* for complainant.

*G. G. Frelinghuysen,* for defendants.

NIXON, J. This suit charges the defendants with infringing letters patent No. 184,352, granted to the complainant, November 14, 1876, for "improvement for apparatus for drying hides." The patentee states that the object of his invention is to furnish an improved means for drying and stretching hides, * * * being so constructed that the hides may be stretched in any desired direction, and to any desired extent, and thus dried without fold or wrinkle. In the specifications he thus states the nature of his invention:

"The invention consists in the extensible frame to receive the hide, formed of the four bars, having their ends slotted, and the clamping bolts; in the combination of the sliding bars, and their pins, with the extensible frame and with the table; in the combination of the lever, and the pivoted fulcrum bars, the ropes, the shafts, the ratchet-wheels, the pawls, and the hand-levers, with the table and the sliding bars; and in the combination of the swinging blocks, and their pivoting straps, with the extensible frame and the clamping bolts, as hereinafter fully described."

There are four claims, all of which, except the first, are combination claims. The elements of the mechanism are old, but it is claimed that a new and useful result has been secured, to-wit, a larger surface area of the hide by stretching it in every direction under a strain equally and simultaneously distributed over the whole surface.

Various defenses have been set up in the answer, but on the final hearing the principal stress seems to have been laid upon the two following: (1) That the complainant was not the original and first inventor of the combined mechanism of the second, third, and fourth claims. (2) Not infringement, as the only machine used by the de-

fendants was constructed with the knowledge and consent of the inventor before any application was made for the patent.

1. With regard to the first, it is insisted by the defendants that the mechanism of the second and third claims was the invention of one Levi Dederick, and that the fourth claim was suggested by the defendant Reynolds. It appears from the testimony that during the summer of 1876, and while the complainant was a member of the firm of Reynolds, Duffy & Co., he was engaged in perfecting his devices preparatory to applying for a patent. He caused to be constructed, at the expense of the firm, a completed mechanism in order to test the practicability and usefulness of his machine for stretching hides. A machinist named Dederick was called upon to do the work. The complainant testifies that he explained the invention to him, and consulted with him as to the best means of accomplishing the desired result.

"I took him up stairs," he says, "and showed him a frame of the table with which I had been experimenting and explained their operation to him; and, standing there at the table, I told him, 'I now want a table constructed with an outside frame similar to this one, and in it put eight slides or arms to be operated with levers and a windlass, so connected that when the windlass is turned the levers will cause the slides to move outwards all at the same time, just like moving your hands out this way, [stretching apart his hands.] The slides or arms moving out from the sides must be near the ends; those moving out from the ends must be near the sides. In these slides I want holes bored and pegs or stops made to fit them, so they may be moved from one hole to another, as may be needed. These pegs must stand high enough from the top of the slides to catch the sides and ends of the table; then the operation will be this: Put the frame on the table; loosen the corner bolts; see the size of the hide; adjust the frame and pegs or stops to it; tack the hide on; turn the windlass; that moves the slides; the pegs move with them and extend the frame; when far enough extended, fasten the corner bolts, loosen the windlass, take the frame off the table, and the slides fall back to the starting point.' I then asked him if he understood my description. His answer was: 'I do; give me the measurements, and I will make the table just as you have described.'"

Mr. Dederick gives the whole statement an unequivocal denial. He says that he was temporarily residing in Newark from the month of February, 1876, to the spring of 1877, occupying a part of the tannery of Reynolds & Word, endeavoring to develop a new tanning process. While he was there the complainant became a member of the firm. About the month of May, 1876, Mr. Duffy took the witness to an upper room in the building and exhibited to him a stretching table and frame, and explained to him its construction and mode of operation. He also stated to him the result he sought to accomplish, but gave no hint or made any suggestion of the way of doing it. His plan of spreading the frame, so as to stretch the hide, was carried out by the use of screws, which, he said, was too slow in operation. He asked him if he could get up anything that would answer that purpose and be better. The witness replied that he thought he could. He then studied upon the matter, and afterwards explained to Duffy

and Reynolds the plan that he conceived, and they concluded to try the experiment. He expressly claims that, excepting the frame, all the parts and mechanism of the table were made after his own planning, without a suggestion from the complainant of any method or mechanism by which it could be made operative. He first tried a simple lever to be operated with the foot, but this proved insufficient in power. He then substituted the windlass with a hand-lever and the pawl and ratchet.

It is also claimed that the swinging blocks attached to the clamping bolts of the stretching frames (the subject of the fourth claim of the patent) were the invention of the defendant Reynolds, and was communicated by him to the complainant. Reynolds testifies that when the frames were first put in use it was found that there was a looseness at the shoulders of the hide, between the neck and the foreshank, which was objectionable. To remedy this he proposed to Duffy the use of the swinging block, as shown in the model, and made a drawing of the same on an iron door with chalk, which he exhibited to the complainant. The latter thought it was a good device, and said they had better have some made for trial, which was done. Afterwards all the frames were provided with these swinging blocks.

This statement is explicitly denied by Duffy. He says that after Dederick had completed the frames under his directions, and after the firm of Reynolds, Duffy & Co. had begun to use them, he discovered that the bag-piece hung over, and that there was not sufficient tacking surface on the face of the frame to accommodate it, and he ordered the pieces to be put on the outside edge of the ends of the frames, to increase the tacking surface, and also the piece on the inside of the neck, where the middle of the neck came, for the same purpose.

"After that," he continued, "I told Reynolds * * * that I wanted an attachment made for the frames. I said to him, 'Please come with me to the drying loft, and I will explain to you just what I want made.' He did so; and at the table, standing right over it, I said to him: 'I want a piece of board this shape,' describing it just as it is here, pointing with my finger, [the witness points to the swinging corner-blocks in complainant's exhibit model,] 'fastened with hoop-iron straps to the corner bolt, light and narrow straps on the board in this shape, and long enough to cross each other, so as to admit of being riveted to one end of a wider and heavier strap, which at the other end I want punched to admit the corner bolt. These straps on the board must be narrow, so as to interfere as little as possible with the tacking surface, and the connecting strap wide enough and heavy enough to leave stick enough, after punching, to insure the necessary strength. Have a few of these made till I see how they will work.' * * * The corner pieces were made in exact accordance with my request, were applied, worked well, and became part of the frame."

Such contradictions, arising, it is hoped, from lapses of the memory, are painful and embarrassing. Looking through the testimony for corroboration of one story or the other, I do not find much in the

case to materially strengthen either side. There are some acknowledged facts, however, in the subsequent conduct of the witnesses which add weight and force to the statement of the complainant. For instance, he shortly afterwards applied for the patent, embracing all these elements of the combination, making oath that he was the original and first inventor, and with the knowledge of Reynolds and Dederick, and without any opposition on their part except, as they allege, a feeble and half-hearted inquiry whether he did not intend to recognize their suggestions as entitling them to some interest in the patent. The firm of which Reynolds was a member, and with his assent, began to pay to the complainant royalties for its use as soon as the letters patent were granted, and Dederick acknowledges that years after the patent was obtained he asked permission of the patentee to construct a single machine for the use of a relative, which was refused unless he would agree to pay the fixed royalty for the same.

But, waiving all this, the burden of proving such a defense is upon the defendants. Any doubt respecting the evidence is fatal. This was held to be the law by the circuit justice (BRADLEY) and the judge of this circuit (McKENNAN) in *Patterson* v. *Duffy*, 20 Fed. Rep. 641, in which these learned judges, when considering the allegation that the complainants derived their idea of the patented invention from some third party who first conceived it and communicated it to them, said:

"The proofs are conflicting, and while we are of the opinion that the scales incline in favor of the complainants, it can, at least, be said with confidence that the defense is not clearly sustained. That is enough to resolve the case in favor of the complainants."

2. The second point has been more perplexing and troublesome. Section 4899, Rev. St., declares that every person who purchases of the inventor, or with his knowledge and consent constructs, any newly-invented machine prior to the application of the inventor for a patent, or who sells or uses one so constructed, shall have the right to use, and vend to others to be used, the specific thing so made or purchased without liability therefor. The provision is explicit, and has existed in the several patent acts since the enactment of section 7 of the act of March 3, 1839. As was stated by the supreme court in *McClurg* v. *Kingsland*, 1 How. 208, its object was twofold: (1) To protect the person who has used the thing patented, by having purchased, constructed, or made the machine to which the invention is applied, from any liability to the patentee or his assignee; (2) to protect the rights granted to the patentee against infringement by any other persons. For before this section any public use or sale of the thing patented, with the consent and allowance of the inventor, before his application for a patent, was a defense which anybody might set up, and which if successful avoided the patent altogether. See section 15 of the act of July 4, 1856, (5 St. 123.)

But section 4899 must now be construed in connection with section 4886 of the Revision, and it may be said generally that while the latter section makes void every patent where it is shown that the invention was in public use or on sale for the period of two years before the application for the patent, the former one, although allowing the letters patent to stand, excepts from liability to the inventor all persons who have used for less than two years any patented machine or articles that has been purchased or constructed with the knowledge and consent of the inventor prior to his application for the patent.

Let us consider the facts of the present case in connection with the statute. The application for the patent was made October 14, 1876. Duffy, the patentee, became a member of the firm of Reynolds, Duffy & Co. in the early spring of the same year. He had been experimenting upon a stretching-machine a year or two before this time, and had not succeeded in constructing one that worked to his satisfaction. Accepting his statement as true, because, although denied, it has not been overborne by satisfactory preponderating evidence, he exhibited to Reynolds and to Dederick, shortly after his promotion to the partnership, the point to which he had reached in his invention, and the mechanism with which he proposed to complete it. At his request, and with the assent of Reynolds that the firm should be responsible for the expenses, Dederick began to construct a machine embracing, in order to make it effective, the mechanism which was afterwards patented, and finished the same as early as June or July of that year. When completed it was set up in the establishment of Reynolds, Duffy & Co., and used by them before and after the application for the patent; the patentee consenting that they should have it without the payment of royalty as long as the firm continued. The partnership was dissolved in the month of February, 1882, and the machine and frames were sold and transferred by Duffy, the retiring partner, to the defendants. It is in evidence, and not disputed, that when the sale took place the complainant asked the defendant Reynolds whether he expected to pay the usual royalty, stating that no use would be allowed without such payment,—this was in February, 1882,—and Reynolds replied that he would think about it. He thought about it until the month of June following, when he wrote to Duffy, declining to pay anything for the use of the invention, not because he had purchased the machine and therefore had the right to use it, but because he considered the patent entirely invalid and worthless. What right or privilege of using the machine and frames did the defendants acquire by such construction, purchase, and use prior to the application for a patent? Or, in other words, was this such a public use or sale, with the knowledge and consent of the inventor of the thing afterwards patented, that, under the provisions of section 4899, the patentee is estopped from demanding royalty for its continued use?

I have no difficulty about the first construction by Dederick, under the direction and supervision of Duffy. That was, doubtless, allowable. The facts clearly show that it was by way of experiment, or in order to bring the invention to greater practicability. Curt. Pat. § 134; *City of Elizabeth* v. *Pavement Co.* 97 U. S. 134. He had the right to defer his application for the patent, and to hold the completed machine for a reasonable time for experimental purposes. But after it was completed and tried and found to be successful, did he not fly in the face of this section by consenting to and sanctioning its public use by Reynolds, Duffy & Co. before he filed his application for a patent, and can he now complain because the purchasers of the "specific machine" demand the privilege of its further use without compensation to the inventor?

After some hesitation, I have reached the conclusion that, while the complainant's patent is valid, there has been no infringement by the defendants, under the provisions of section 4899, by their use of the invention, and will not be as long as they confine themselves to the "specific machine" and frames, the use of which the inventor consented to and allowed before he applied for the patent.

Let the bill be dismissed.