BAUS v. COPONY.

(Court of Appeals of District of Columbia. Submitted November 25, 1921. Decided January 3, 1922. Rehearing Denied February 4, 1922.)

No. 1458.

1. Patents ⚙⇒91(4)—Evidence held to show junior party to interference was first to conceive invention.

In an interference proceeding involving a decking system for suspending automobiles in freight cars, so as to provide clearance for a second automobile beneath the first, evidence, consisting of oral testimony and letters and invoices respecting the use of a new system of loading, *held*

to show that the junior party conceived and disclosed the invention prior to the senior party's date of conception.

2. Patents ☞106(2)—No inconsistency between preliminary statement and testimony showing earlier experimental operation.

An inventor of a decking system for suspending automobiles in freight cars during transportation was justified in subjecting it to a practical test before reaching a definite conclusion as to its practicability, and where it required a month or six weeks for experimental shipments to reach their destinations there was nothing inconsistent between his preliminary statement, in which he alleged that the device was first successfully and practically operated on or about April 15, 1916, and evidence showing that conception of the invention was completed in October or November, 1915, and that it was then being tried out, though mechanical changes were afterwards made.

Smyth, Chief Justice, dissenting.

Appeal from a Decision of the Patent Office.

Interference proceeding between Richard E. Baus and Alfred Copony. From a decision awarding priority to Copony, Baus appeals. Reversed.

James L. Stewart, of New York City, for appellant.

L. A. Janney, of Chicago, Ill., and J. H. Milans and C. T. Milans, both of Washington, D. C., for appellee.

ROBB, Associate Justice. This appeal involves concurrent decisions of the Patent Office tribunals in an interference proceeding awarding priority of invention to Copony, the appellee, to whom a patent covering the subject-matter had been issued prior to appellant's filing date. The two counts of the interference read as follows:

"1. The combination, with a freight car, of means for suspending an automobile therein to provide clearance for a second automobile beneath the first; said means comprising a triangular brace member forming a triangular brace in both vertical and horizontal planes.

"2. In a decking system for automobiles or the like in freight cars, the combination with a brace member, extending diagonally upward from the floor of the car and inwardly from the side thereof, of a transverse brace member co-operating with said first-mentioned brace member."

The invention, as indicated in these counts, relates to a system of loading automobiles on freight cars, whereby one machine is suspended over another and supported in that position by the device of the issue. In the Baus system there are four triangular braces employed for each double deck car, each brace comprising a relatively short and a relatively long leg secured together at their upper ends; the axle of the automobile resting upon the brace formed by these legs. The lower ends of these legs are secured to the car floor at or near the side of the car, the legs inclining upwardly and inwardly, and being braced at their upper ends by a member that connects them with the adjacent side of the car. It is a comparatively simple invention, and easily understood by any one having any mechanical knowledge.

Copony, in his preliminary statement, alleges conception and disclosure during the latter half of January, 1916, and reduction to practice

at a later date. We shall assume that, by competent proof, he has established the various dates alleged.

[1] Previous to his connection in 1913 with the Studebaker Corporation, manufacturer of Studebaker automobiles, Baus had been manager of the Dayton plant of the Maxwell Automobile Company, where he had experience in loading automobiles. He was assistant manager for the Studebaker Corporation, and his duties included supervision of loading operations. In September of 1915 he commenced to devise "the new system" of loading here involved. He says:

"I had been more or less interested in the shipping and the troubles we were having, and they were getting more serious all the time, and they got to a point where we decided that something had to be done to get up a decent system that would stand all the bumps and rough handling that a carload of automobiles was put to in transit, and we gave the matter a lot of study. * * * "

Mr. Baus testified that in the latter part of September or early in October he conceived this invention, and immediately had his inspector of final loading, Mr. Henry, build an apparatus embodying his ideas. After this apparatus was completed, it was put in a freight car and an automobile placed thereon, after which the device was subjected to a test by having the freight car shunted down a track and against another car. The result was not altogether satisfactory, although Mr. Baus testified that—

"We could see, however, that we had something there, and we immediately set out to improve it. For instance, we did not have the angle of the legs, the one angle, or the one leg that was supposed to take most of the shock, the end thrust, the angle was not great enough, and the horses tipped over; so we immediately saw we had to raise out this one leg to give it the correct angle. * * * "

He also increased the length of the longer leg. These changes were made almost immediately, and, after a few more tests, he became satisfied that he had a device that would warrant experimental use in shipping automobiles. Thereupon he directed that 50 sets of the new deck, by which the new apparatus then was known, be made up and used from time to time in sending out automobiles. This, Mr. Baus testified, was done. He further testified that he caused to be sent out to the consignees of these various shipments a circular letter, the first of which, under date of November 26, 1915, was sent to C. N. Weaver, of San Francisco, Cal. This letter, which Mr. Baus testified was returned by Mr. Weaver at his request for purposes of the trial, was introduced in evidence without objection. It reads in part as follows:

"Within the last three or four months we have been having some complaints from dealers relative to wrecked automobiles, due to the upper automobile dropping down on the one below. * * * We have investigated the matter very carefully, and have adopted a new system of double-decking. We have every confidence that the new system will overcome the trouble entirely, but, of course, we cannot tell in what condition the cars arrive, unless our branches and dealers inform us regarding same. We therefore ask that you kindly delegate some one to look over the shipment when it arrives, and advise us as to the condition of same. If the upper car or its supports are damaged in

any way whatever, will you kindly give us in detail just exactly what happened?

"We shipped you November 23d in S. F. car No. 64696 a carload of automobiles on which we used this new system of loading. When it arrives will you kindly advise us immediately as to its condition?

"The Studebaker Corporation,
"(Signed)  R. E. Baus, Asst. Production Mgr."

Mr. Baus identified his signature to this letter. There was produced by another witness, under cross-examination, a copy of the invoice of this shipment, under the date mentioned, with the notation thereon "New Deck." This copy was taken from the files of the Studebaker Corporation, and there was testimony that it had not been changed, and that the notation had been made by an inspector at the time of loading or immediately thereafter. No objection was interposed to the introduction of this copy in evidence.

Mr. Baus also testified that the period covered in the use of these 50 sets probably extended to about April following, that he received a substantial number of replies to the circular letters sent out with the shipments, and that the replies were favorable. After most of the old stock on hand was used up, the new system entirely displaced the old.

Mr. Henry, inspector of final loading, testified to having completed the first apparatus under the direction of Mr. Baus and to the various experiments with that apparatus. Under cross-examination he admitted, as did Mr. Baus, that the first tests were not satisfactory. He was asked:

"Q. So that the third time you tried it, what was the result then? A. Well, he [Baus] was tickled to death; he was satisfied.

"Q. Did that work satisfactorily? A. Yes, sir. * * *

"Q. So that, as early as October, 1915, he had so adjusted his ideas as to make it practicable, did he? A. Well, it developed that it was practicable afterwards, but until we made the tests to ship the cars, I did not know whether it was practicable or not.

"Q. Well, on the third, he was tickled to death. What was the fourth experiment, if you made a fourth? A. Well, he gave me orders then to have the carpenter make up 50 sets."

The witness then testified that the first actual shipment in which the new deck was used was on October 29, 1915. There was produced under cross-examination by another witness, Mr. Cook, who had direct charge of shipments, and introduced in evidence without objection, a copy of the invoice of that shipment, giving the initials of the freight car, the motor and serial numbers of the automobiles, and bearing the notation "New Blocking." This witness corroborated the testimony of Mr. Baus as to the use of these 50 sets in shipping out automobiles.

In September of 1916 Mr. Henry and Mr. Cook were sent out by Mr. Baus that they might personally consult the various consignees to whom shipments had been made, and personally observe the working of the new system. They spent several weeks in this work, and their investigation satisfied them fully as to the practicability of the new system.

Mr. Cook, on cross-examination, gave the names and addresses of many of the consignees of shipments in which the first 50 sets of new decking were used, and, at the request of counsel for Copony, produced copies of the invoices, which were introduced in evidence.

It was developed during the cross-examination of the witness Cook that the new deck or shipping device weighed considerably less than those previously used, and that the Studebaker Corporation, being a member of the "Joint Weight and Inspection Bureau," under the control of the Interstate Commerce Commission, reported that difference in weight, and there was introduced in evidence the original agreement, under date of August 22, 1916, between the Joint Weight Inspection Bureau and the traffic manager for the Studebaker Corporation. At that time the new system had displaced the old. It further appeared that on November 15, 1916, the appellee, Copony, visited the Studebaker plant and was shown the Baus device, which he admitted was "in substantial conformity with that which was illustrated" in the Baus drawing.

The Examiner of Interference did not regard the proof offered by Baus as sufficiently definite. The Examiners in Chief, while of the view that the testimony of Baus, Henry, and Cook "does establish the fact that the system experimented with by the Studebaker Corporation, with a view to changing the old system of decking above described, did embody the subject matter in interference," and that "Baus was justified in taking the course he says he pursued in sending out cars loaded according to his system a few at a time, and in waiting for reports from the consignees as to the condition of the car on its arrival," were not satisfied that Baus had established a date of conception prior to January of 1916, when Copony entered the field. The Board also was not satisfied that the circular letter was written and sent out on the date it bears. The Assistant Commissioner who considered the case also criticized the testimony concerning this letter, saying:

"Had that letter been dated 1916, instead of 1915, it does not appear that Baus or Cook or Henry would have any recollection that it was in fact written on a different date."

The Assistant Commissioner further criticised the Baus proof, because a Mr. Prue, an inspector of loading, who made many of the notations "New Deck" or "New Decking" on copies of the invoices, had not testified, although it appeared that this man was a soldier in France, and therefore not available as a witness. None of the tribunals attached importance to the fact that each of these exhibits was introduced in evidence without objection.

Briefly summarized, the proof offered by Baus amounts to this: He has testified fully, candidly, and convincingly to events leading up to the conception and disclosure of this invention prior to any date even claimed by Copony. He has testified with equal candor and persuasiveness to the making, under his directions, of a device embodying the issue prior to the entry of Copony into the field. Mr. Henry and Mr. Cook, whose testimony convinces us of their integrity and good faith, corroborate Mr. Baus in detail. The testimony of these three witness-

es is reasonable, consistent, and free from any taint of suspicion. In addition, there was introduced in evidence a circular letter, without objection from appellee, as we have said. Supplementing this letter, the names and addresses of the consignees of machines sent under this new system, together with the dates of these shipments, were furnished appellee. And yet we are asked, in effect, to hold that these three witnesses have deliberately committed perjury, and have fabricated all the documentary evidence about which they have testified. It is inconceivable that counsel for appellee would have failed to call one of the many consignees of these shipments, had there been the slightest doubt as to the truth of this testimony, and, after their failure to do this, there is every reason why we should accept this convincing proof, and no reason why we should reject it.

In Smith v. Kihlgren, 43 App. D. C. 193, where we reversed concurrent decisions of the Patent Office, and where there was evidence from credible witnesses that a machine embodying the issue had been made by the appellant, and was in existence and accessible to the appellee, we held it was the duty of appellee to meet this evidence before asking us to reject it. To the same effect is Schneider v. Driggs, 36 App. D. C. 116. In Tompkins Co. v. N. Y. Woven Wire M. Co., 159 Fed. 133, 86 C. C. A. 323, an infringement suit, in which the defense was prior use, and supported by the testimony of a single interested witness, Judge Coxe, speaking for the Circuit Court of Appeals, said:

"Is Mr. Prince's statement true? Having in mind the fact that he is an interested witness, and that his statements must be established beyond a reasonable doubt, we see no way to avoid the effect of his testimony, unless we are prepared to say that he has committed willful perjury. This we cannot do. Mr. Prince appears on the record to be an intelligent, straightforward, conservative business man. * * * Though he did not produce a Regis spring, he gave the names of a number of dealers to whom the spring had been sold, so that, if his statements were untrue, it could easily have been discovered by an examination of these persons and the defendant's books. There is nothing astonishing or inherently improbable in Prince's testimony and we cannot disregard it."

[2] Counsel for appellee find an inconsistency between the proof offered by Baus as to reduction to practice and his preliminary statement, wherein he alleges:

"That on or about the 15th of April, 1916, said construction or device was first successfully and practically operated in the city of Detroit."

We agree with the Examiners in Chief, however, that Baus was quite justified in subjecting his invention to a practical test before reaching a definite conclusion as to its practicability. There is evidence that it required a month or six weeks for the experimental shipments to reach their destinations. While conception of the invention by Baus was complete in October or November of 1915, various mechanical changes were made in the device thereafter, and it well may have been that he did not regard the structure as complete until the end of the experimental period. In Elizabeth v. Pavement Co., 97 U. S. 126, 24 L. Ed. 1,000, an inventor had put down a pavement and permitted its use for more than two years before he filed his application for patent,

yet the court held that the use was justified because necessary to determine practicability. In Jenner v. Bowen, 139 Fed. 556, 561, 71 C. C. A. 540, 545, Judge Lurton, afterwards Justice Lurton of the Supreme Court, considering what constituted such a public use as to defeat a patent, said:

"A use which is impliedly excepted out of the prohibition of the statute is a use which may be properly characterized as substantially for purposes of experiment."

We regard the use as to the Baus device prior to April of 1916 in the same light.

In our view, the evidence in behalf of Baus establishes beyond a reasonable doubt that he is the prior inventor of the subject-matter of the claims here involved, and we therefore reverse the decision of the Patent Office.

Reversed.

SMYTH, Chief Justice, dissents.